IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JASON JEROME ROSS, | ) |
| | ) NO. 4:08-cr-00070-RP-CFB |
|     Plaintiff, | ) |
| | ) |
| vs. | ) REPORT AND RECOMMENDATION |
| | ) |
| DWIGHT KELLER, DONNA COOK, | ) |
| TERRY MAPES, | ) |
| | ) |
|     Defendants. | ) |

This action comes before the Court on Plaintiff's Complaint brought under 42 U.S.C.

§ 1983.  Plaintiff, Jason Jerome Ross, is an inmate at Newton Correctional Facility (NCF).  He

alleges that Defendants – Dr. Dwight Keller, D.D.S., prison dentist; Donna Cook, Health

Services Supervisor; and Terry Mapes, Warden – violated his Eighth Amendment rights when

they failed to provide him with proper dental care, specifically a root canal and crown for an

infected tooth.  Ross requests a root canal and crown, and reimbursement for his costs in this

case.  Alternatively, if a root canal and crown are no longer feasible and he loses his molar, he

requests compensatory monetary damages.[1]  Defendants deny the Plaintiff's allegations.

---

[1] Ross has not stated whether he is bringing his section 1983 action against Defendants in
their official or individual capacities.  To sue "a public official in his or her individual capacity, a
plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be
assumed that the defendant is sued only in his or her official capacity." *Johnson v. Outboard
Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) (quoted in *Lopez-Buric v. Notch*, 168 F. Supp.
2d 1046, 1049 (D. Minn. 2001)).  This rule insures notice will be given to public servants when a
plaintiff seeks to recover money damages from them directly in their individual capacity under
section 1983.  *Id.*  Ross is seeking money damages from Defendants.  Because he has ample time
to seek amendment of his Complaint, and because of the recommendation below, the Court will
not assume for purposes of this Report and Recommendation that Defendants are being sued
only in their official capacity.

This matter was referred to the undersigned on July 1, 2008, for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).  An evidentiary hearing was held on November 4, 2008.  Patrick E. Ingram represented Plaintiff, and William A. Hill represented Defendants.  After carefully reviewing the evidence and file, the Court finds and respectfully recommends as follows on the issues presented.

## FINDINGS OF FACT

Defendant Keller, a licensed dentist, began working at NCF in approximately 1988. Prior to working at the prison, Dr. Keller had practiced dentistry in the U.S. Army, in a clinic serving indigents, in private practice, and at Broadlawns Medical Center in Des Moines.  He was the only medical expert who testified at the evidentiary hearing.

Dr. Keller characterized his practice at NCF as a general practice, but one having restrictions and limitations.  He said his prison practice was more similar to public health practice than to private practice.  At the prison, the dentist testified, there was a "substantial amount of turnover of clientele," and the focus was on inmates' acute care issues, including infections and acute pain.  (Evid. Hr'g Tr. 25, Nov. 4, 2008.)

Acute care issues had the potential for becoming hospitalization cases, he stated.  One of the primary concerns in Dr. Keller's prison practice was to minimize or reduce hospitalizations, "which obviously are more serious and considerable in cost."  *Id.*  The dentist testified the prison's dental staff spent most of their time on removing teeth, followed by doing tooth restorations, then "preventive areas, such as cleanings, oral hygiene," and, lastly, "replacement . . . which would be prosthodontics, making of dentures and partials."  *Id.* at 27.

Prosthodontics is defined as, "The branch of dentistry pertaining to the replacement of missing teeth or soft tissues with bridges, crowns, implants, and prostheses.  Replacements may

2

be fixed or removable, and may repair defects within the mouth, or in maxillofacial structures."
TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1791 (2005). Dr. Keller testified that the Iowa
Department of Corrections' (IDOC) policy in effect while he was working at NCF prohibited
providing fixed prosthetics. Fixed prosthetics include crowns. California Dental Association,
http://www.cda.org/library/cda_member/policy/quality/fixed_prosthetics_veneers_crowns_bridg
es.pdf (last visited Jan. 25, 2009). Dr. Keller stated the dental policy allowed, but did not
require, the provision of removable prosthetics, depending on a recommendation.

IDOC's Health Services Policy HSP-82.1001[2], which Ross attached to his Complaint,
stated, "The following services are *not* provided by the Department of Corrections: . . . Fixed
prosthodontics, (i.e., cast restorations, fixed bridgework, or other laboratory fabricated fixed
restorations)." (Compl. Attach. 5 (emphasis in original).) The policy stated that a dentist must
determine the need for a removable prostheses, considering, among other factors, that
"prosthetics are offered to provide function, not for cosmetic reasons." *Id.* at 4. The policy was
signed by Harbans Deol, D.O., Ph.D., IDOC's medical director, and Carl Weilbrenner, D.D.S.,
IDOC's dental consultant.

Dr. Keller stated that at the prison, specialized dental care was restricted. Of the primary
dental specialties, which he identified as including oral surgery, endodontics[3], orthodontics,

---

[2] Health Services Policy HSP-82.1001 is the only written policy in the record. The policy
listed its effective date is June 24, 2004. Defendants do not dispute, and the Court finds, that the
relevant portions of the policy were in effect during the period at issue when Dr. Keller was
treating Ross at NCF.

[3] Endodontics is, "A field of dentistry concerned with the diseases and injuries of the
dental pulp and periapical tissues, and with the prevention, diagnosis, and treatment of diseases
and injuries in these tissues." STEDMAN'S CONCISE MEDICAL DICTIONARY FOR THE HEALTH
PROFESSIONS 284 (3d ed. 1997). "Periapical" means, "At or around the apex of the tooth." *Id.* at
662.

periodontics, and prosthodontics, NCF offered referrals in only oral surgery, the dentist stated.

"General dentists generally can do most of those types of things at a limited level," he testified,

"but if the case is sophisticated enough and requires, to be successful, specialty care, the only

specialty services we have available to us is [sic] the oral surgery, and again that is primarily to

minimize or reduce hospitalizations."  (Hr'g Tr. 27.)  Similarly, Policy HSP-82.1001 stated, "On

a limited basis, oral surgery is the only dental specialty in which a referral can be made.  All

other treatment specialties must be provided by the institutional staff."  (Compl. Attach. 6.)

In July 2007, Ross, then age 34, submitted a kite, a medical request form, indicating he

had tooth pain.[4]  Dr. Keller examined Ross' teeth on July 23, 2007, in the prison's health

services department.  He identified the source of the inmate's pain as tooth #19, a molar on the

lower left side of Ross' mouth.  The molar had an existing filling.  An X-ray revealed no decay

in the tooth.  Dr. Keller determined that food lodging in a gap between the molar and the

adjacent bicuspid, tooth #20, probably caused the pain.  He advised Ross to floss his teeth after

eating, and told the inmate to request another dental appointment if his symptoms persisted.  Dr.

Keller stated he initially believed Ross' pain could be resolved with restoration, which would

entail applying material to the tooth to close the gap between teeth #19 and #20.

On July 25, 2007, Ross returned to health services, where he complained to Frank

Filippelli, D.O., about tooth pain and nasal discharge.  For the pain, the doctor prescribed

ibuprofen.  He diagnosed an allergy as the cause of the nasal discharge and noted that Ross said

nasal spray helped.

On July 30, 2007, Ross again saw Dr. Keller after sending a kite complaining that his

---

[4] Ross' kites requesting medical care for his teeth are not themselves part of the record. Health services personnel paraphrased and quoted the inmate's kites in his medical record.

4

tooth was sensitive to pressure and to being wiggled.  Ross told the dentist that the ibuprofen that medical staff had prescribed was "not working."  (Defs.' Ex. D 7.)  Ross said he could not eat, and tooth #19 was "tender to pressure."  *Id.*

Dr. Keller x-rayed tooth #19 again and found no decay.  When he wiggled the tooth, Ross expressed sensitivity.  The dentist suspected the pain was not caused by the gap between Ross' teeth, as the dentist had originally thought, but rather by pulpitis, or inflammation of the pulp, in tooth #19.  Pulpitis would account for Ross' periodic pain episodes, the dentist testified. (Hr'g Tr. 33.)

Pulpitis "will either go one of two ways," Dr. Keller stated, and "generally I would assume the tooth would probably die."  *Id.*  He explained that necrotic, or dead, tissue in a dying tooth and its roots is a source of infection, pain and discomfort.  The only two treatments for a dying tooth are either a root canal or an extraction, the dentist testified.

During a root canal, Dr. Keller stated, the dentist first opens a hole in the tooth's crown and removes necrotic and other pulp tissue from the pulp and root, in a process called extirpation.  The process, also known as pulpectomy, is the "complete removal of the pulp tissue from the pulp chamber and root canal, irrespective of the state of health of the pulp."  TABER'S 1817.  Next, according to Dr. Keller, the dentist fills the root canal with material and puts a cap, also called a crown, on the tooth to protect it.  Without the crown, he testified, the tooth would probably fracture after the root canal, because when a tooth dies, it loses dental fluid and dries out.  For this reason, "when you do a root canal it is recommended that you put a crown on it," the dentist testified.  (Hr'g Tr. 33.)  He estimated that thirty to sixty percent of the failures of root canals are caused by failing to properly restore the tooth with a crown.  Restoring the tooth with a crown, the dentist stated, "is imperative if you're going to provide the root canal

treatment.  The two go together."  *Id.* at 43.

Dr. Keller testified that root canals are easier to do on anterior teeth than on molars, such as Ross' tooth #19, because anterior teeth have one root, while molars have two roots.  "Multi-rooted teeth are complex," he stated, noting that Broadlawns Medical Center has restricted its endodontic care to anterior teeth only, because of problems the hospital had when it tried to expand its dental program to include more sophisticated endodontic care.  *Id.* at 39.  The dentist testified that most endodontists use microscopes "anywhere from 10 to 30 power" for doing root canals on multi-rooted teeth.  *Id.*

After examining Ross on July 30, 2007, Dr. Keller increased the inmate's pain medication from ibuprofen to Darvocet, to learn "the status level as to where [the condition of tooth #19] is going.  If [the Darvocet] doesn't seem to work very well, then the odds are the tooth needs to be removed because it is only going to progress and get worse."  *Id.* at 33-34 (alterations added).  Dr. Keller also placed Ross on the waiting list for a possible tooth extraction.

On the inmate's medical record, Dr. Keller classified the condition of tooth #19 as Priority II.  Policy HSP-82.1001 stated, "Within the limits of available dental resources, care and treatment should be provided consistent with" three listed priorities.  (Compl. Attach. 4.) Priority I required dental service providers to "evaluate and/or treat as quickly as possible, no later than the next working day," conditions such as incapacitating pain, facial swelling, facial trauma, suspected serious pathological conditions, and profuse bleeding.  *Id.*  Priority II called for scheduling treatment as soon as possible for, "[g]ross" caries, also called decayed areas, "requiring extraction, pulpotomy, sedative fillings, or major operative treatment."  *Id.* (alteration added).  "Pulpotomy" is defined as, "Removal in a dental procedure of the coronal portion of the

6

pulp of a tooth in such a manner that the pulp of the root remains intact and viable." MERRIAM-WEBSTER'S MEDICAL DICTIONARY 625 (2006). A tooth's corona is "that part . . . that is covered with enamel, or an artificial substitute for that part." STEDMAN'S CONCISE MEDICAL DICTIONARY FOR THE HEALTH PROFESSIONS 201 (3d ed. 1997). Other treatments listed as examples under Priority II included, "Initial treatment phase of periodontitis II, III, IV including scaling, root planing, and oral hygiene instruction"; "Endo filling and obturation"; and "Re-cementing fixed prostheses." (Compl. Attach. 4.) Examples of Priority III treatment included "Small carious lesions"; "Prophylaxis"; and "Partial or full denture construction, repair or reline." *Id.* Prison dentists used their "professional judgment to upgrade or downgrade the priority of an offender's dental condition." *Id.*

The record contains no evidence that Ross wrote any kites or had any dental or medical visits between July 30 and October 29, 2007, when he next saw Dr. Keller for repair of a cavity on tooth #31. The dentist testified that Ross, "had no symptom or references to other teeth" on October 29. (Hr'g Tr. 34.)

Ross saw Dr. Keller again on November 26, 2007, after writing a kite complaining that his lower left tooth "bothers to pressure." (Defs.' Ex. C 10.) Dr. Keller examined tooth #19 and found that it "wasn't extremely loose. It was fairly stable, but yet had sensitivity." (Hr'g Tr. 34.) An X-ray showed an abscess on one of the tooth's two roots.

Ross testified that Dr. Keller told him the tooth would probably have to be removed. The inmate stated he asked if that was the only option available. According to Ross, the dentist asked if he was going to be discharged from the prison soon, and Ross replied no. Ross stated in his affidavit that his discharge date is 2020. Ross testified that Dr. Keller said, "If you're getting out within the next year, year and a half, the only thing that it would need was a root canal, and a

crown to protect the tooth once the root canal is performed." *Id.* at 6.  The inmate stated that Dr. Keller said he was unable to do root canals at the prison, and even if he were able to do the procedure, he could not put a crown on the tooth because IDOC considered a crown cosmetic in nature; basically, the only thing the prison could do for Ross was extract tooth #19.

Ross said he did not want the molar removed; the dentist had previously removed a molar on the right side of his mouth, which made it hard for him to chew food on that side.  Dr. Keller put Ross on the tooth extraction waiting list, and told him to send a kite if he changed his mind and wanted the tooth removed.[5]

The dentist described performing a root canal on tooth #19 as a "sophisticated procedure in the sense of the demands requiring special care," because of "the nature of the tooth." *Id.* at 38.  He stated, "sometime after July 2007," a root canal and crown on Ross' tooth #19 would have been effective, "But it would take a specialist to make it effective." *Id.*  Dr. Keller further stated that even with a specialist doing Ross' root canal in July 2007, or the earliest point where he thought the procedure should be done, there was no guarantee the procedure would work.  He noted, "not all root canals are successful.  I've removed multiple teeth that have had root canals that have failed." *Id.* at 45.

Dr. Keller testified that the option of doing a combination of a root canal and crown was

---

[5] The medical record indicates Dr. Keller also examined Ross on November 27, 2007. (Defs.' Ex. D 5.)  The medical notes for November 26 and 27 are remarkably similar, including the description of Ross' kite, the information that an X-ray was taken and showed an abscess on one of tooth #19's roots, and the indication that Dr. Keller and Ross discussed extraction and Ross was placed on the tooth extraction list, but the inmate did not want his tooth removed at that time.  At the evidentiary hearing, Ross and Dr. Keller did not distinguish between the two dates when discussing the finding of the abscess and their conversation, and therefore, the Court has not distinguished between the two dates for purposes of this Report and Recommendation.

not applicable in Ross' case because of the prison's policy restrictions on referring an inmate for specialty care and on providing crowns.  Accordingly, "the best thing he can do is get his tooth removed," the dentist stated.  *Id.*  Dr. Keller testified that removing tooth #19 would eliminate the source of pain and infection, and Ross would be symptom-free; extraction is "not a bad treatment.  It does solve the issues, and it's very effective, and it does work."  *Id.*

The dentist further stated that extraction is a normal option that is provided to patients with a dying tooth.  If Ross had gone to Broadlawns Medical Center for treatment of tooth #19, Dr. Keller testified, dentists at the hospital would have removed his molar, because of Broadlawns' policy restricting endodontic care to anterior teeth.  If Ross had been his patient when Dr. Keller worked for the Army, he testified, the treatment options would have depended on whether specialty care was available at the military facility.  If specialty care had been available, Ross would have been referred to the specialist for a root canal and crown, but if no specialty care was available at the facility, "his tooth probably would have been removed," Dr. Keller testified.  *Id.* at 40.  In private practice, the first option would have been to refer Ross to an endodontist, the dentist stated.

On December 6, 2007, Ross sent a kite asking, "would it be possible to send me to Iowa City to have a root canal done on my molar?"  (Defs.' Ex. D 3.)  A dental assistant replied, "It's not a possibility.  We refer individuals to Iowa City only to remove teeth that cannot be removed here."  *Id.*  Dr. Keller testified that in his kite, Ross was requesting to go to UIHC "for endodontic treatment, and he was informed that the only referral was for oral surgery."  (Hr'g Tr. 35.)  Dr. Keller stated that Ross, "knew the only referral to go to would be oral surgery.  It would not be endodontics.  We have no capability.  I think everyone in the institution knows that."  *Id.*  No evidence indicated that oral surgeons have the training or equipment to perform root canals

9

and apply crowns to multi-rooted teeth.

On December 10, 2007, Ross wrote a grievance requesting to be sent to UIHC for a root canal.  The grievance officer denied the grievance on January 8, 2008, writing as follows:

> You state that you have a tooth that needs a root canal done or to have it removed and that the dentist told you that he can not do root canals on molars.  You would like to save the tooth and do not feel that this is a cosmetic procedure.  You request to be sent to Iowa City to have a root canal done on the tooth.  While you are under the care of the DOC you are under the care of the DOC physicians and dentists.  They are the ones who determine the treatment.  The dentist has sent you a kite informing you that he is not going [to] refer you to Iowa City.  If you begin experiencing any new or increased symptoms you may choose to kite Health Services.

Compl. Attach. 11 (alteration added).  Ross appealed the denial on January 9, 2008.  He requested to have a root canal and crown.  For the basis of his appeal, he stated:

> A root canal is a pretty common procedure.  As there is not a dentist here at the institution who can do a root canal on molars, I should be taken some where [sic] to have the procedure done.  I have an abscess on this tooth that is only getting worse.  The tooth is a healthy tooth and does not need to be extracted.  I feel the main issue here is the cost of fixing the tooth, versus extraction.

*Id.* at 12.  On January 24, 2008, the deputy warden denied the appeal, writing as follows:

> In your appeal you state that you need a root canal and the dentist at NCF refuses to do this.  You state that your tooth has an abscess and it's getting worse however it is a healthy tooth and does not need to be extracted.  You would like to have your root canal done and a crown placed on your molar.
> I spoke with the dentist he indicated that your tooth is not restorable.  He states he has informed you that he will pull the tooth per your request.

*Id.* at 13.  On January 28, 2008, Ross appealed the denial to IDOC, stating:

> My molar is restorable as the root is not yet dead because I can still feel pain in my tooth.  The dentist here at NCF is not qualified to do root canals on molars.  The dentist is not being truthful when he says my tooth is not restorable.  The truth is it would be cheaper to pull my molar than to fix it.  My tooth has an abscess on it and it is not being treated.  The only reason I thought of a root canal is because the dentist told me that a root canal would correct the problem of my tooth but that he cannot do root canals on molars here.

10

*Id.* at 14.

On January 30, 2008, Ross was seen in health services by Dr. Filippelli for treatment of shoulder pain, for which the doctor prescribed ibuprofen.  Ross also complained about his tooth. Dr. Filippelli believed there was drainage from the tooth (the record does not indicate which tooth) and prescribed penicillin.

On January 31, 2008, Ross sent a kite indicating his tooth was swollen.  Dr. Keller examined him.  The dentist testified he found some edema, or swelling.  The medical record indicates Dr. Keller found a buccal fistula[6] on tooth #19.  He increased the dosage of the penicillin prescription.  Dr. Keller wrote in the medical record, "advised patient to have tooth removed – patient states will consider at a later [time]."  (Defs.' Ex. D 2 (alteration added).) Ross testified he asked the dentist why he would not do a root canal and a crown to fix the tooth, and the dentist "referred back to the Department of Corrections policies and procedures."  (Hr'g Tr. 18.)

On February 1, 2008, an IDOC representative denied Ross' grievance appeal, concurring with the deputy warden's and grievance officer's responses to the inmate's December 10, 2007, grievance.

Ross sent a kite requesting to be placed on the tooth extraction list and asking whether he needed antibiotics.  In response, Dr. Keller examined Ross on February 14, 2008, and wrote the following comment in the medical record concerning tooth #19:  "chronic abscessed tooth with

---

[6] Buccal means, "Pertaining to, adjacent to, or in the direction of the cheek," STEDMAN'S 118, and "Relating to the cheek or mouth," TABER'S 302.  Fistula is defined as, "An abnormal tubelike passage from a normal cavity or tube to a free surface or to another cavity.  It may result from a congenital failure of organs to develop properly, or from abscesses, injuries, radiation, malignancies, or inflammatory processes that erode into neighboring organs."  *Id.* at 804.

11

fistula – no edema clinically at this time."  (Defs.' Ex. D 1.)  Dr. Keller testified that the fistula

had drained, alleviating pressure and edema, and therefore Ross did not need antibiotics.  The

dentist told Ross why he did not need antibiotics at that time.  Dr. Keller offered to extract Ross'

tooth, and Ross declined the offer.

Ross testified that at some point he discussed with Dr. Keller going to UIHC for

treatment, and the dentist "told me that I was going to Iowa City to get my tooth looked at by the

. . . oral surgery."  (Hr'g Tr. 9.)  Dr. Keller stated that in February 2008, he put Ross on the

waiting list for a referral visit to an oral surgeon at UIHC for a tooth extraction.  The dentist

stated the wait was at least approximately six to eight weeks.  Dr. Keller testified he referred

Ross to UIHC for the extraction, not because of the difficulty of the extraction, but because,

"sometimes if someone else tells the person the same story, they then may actually believe it, or

put faith in the fact that that really needs to be done."  *Id.* at 35.

Ross filed his present Complaint on February 22, 2008.

Ross was scheduled to go to UIHC on May 22, 2008.  He believed the purpose of the trip

was "To get my tooth looked at by an oral surgeon or someone that could perform the procedure,

a root canal . . . [o]rthodontist, or . . . [e]ndodontist."  *Id.* at 9.  The morning of the scheduled

trip, however, when Ross learned that he was going to UIHC to have tooth #19 removed, he

declined the trip.

Ross testified that sometime in the summer of 2008, when Defendant Mapes, Warden,

was walking through the institution and talking to inmates, Ross showed Mapes his infected

tooth.  According to Ross, Mapes told him that the only reason that his tooth "wasn't getting

fixed was because of the cost associated with fixing the root canal and associated with a crown."

*Id.* at 11.  The next day, Mapes called health services, and medical personnel gave Ross

12

antibiotics for the infection.  Dr. Keller estimated that the cost to have an endodontist save Ross'

tooth with a root canal and crown would probably be "minimally $1[,]600, optimally maybe

$2[,]200."  *Id.* at 42.  Ross stated he never talked with Defendant Cook, Health Services

Supervisor, about tooth #19 or about needing a root canal and crown.

Dr. Keller retired from NCF on August 1, 2008.  His dental license remains current.

Ross has seen no other dentist besides Dr. Keller for the problems he has had with tooth

#19.  He testified that in approximately the middle of September 2008, a dentist visited the

prison, but Ross instead saw the dental hygienist at that time.  When the dental hygienist asked if

he wanted tooth #19 pulled, Ross answered no, he testified.

Since tooth #19 began bothering Ross, he has had access to ibuprofen.  He testified that

he continues to take ibuprofen, and the medicine helps some, but not much.  He testified his

tooth is, "infected so much now that it like comes to the surface and every two or three days

basically I have to pop it, and it's blood and pus.  I mean it's painful."  *Id.* at 10.  He stated that

some nights he wakes in "excruciating pain."  *Id.*

When asked at the hearing if he thinks tooth #19 is now dead, Ross answered, "I think

it's very close, because it has gotten looser, but it hasn't broken.  It hasn't chipped.  It's still the

same color.  It hasn't gone gray or anything like that.  I mean I don't know, but it still feels alive.

I still feel pain in it."  *Id.*  The inmate stated tooth #19 hurts when he chews on the left side of his

mouth.  He tries to compensate by chewing only on the right side, but the missing molar on that

side makes chewing difficult.

Dr. Keller estimated that a root canal performed now on Ross "probably . . . may have

less than a 20 percent chance of success," considering "the fistula, the size of the abscess he

has."  *Id.* at 38.

Dr. Keller testified that unlike the June 24, 2004, policy in the record, IDOC's present written dental policy has a guideline change that Dr. Deol, the department's medical director, had Dr. Weilbrenner, the department's dental consultant, "write into the dental policy, . . . which states that . . . referrals could be done anywhere."  *Id.* at 43 (alteration added).  According to the dentist, however, the change is "really a misstatement," because IDOC does not have the resources to pay for such referrals, referral clinics want to be compensated, and inmates cannot pay for the referral services.[7]  *Id.*  IDOC's present written policy is not in the record.

## ANALYSIS AND FURTHER FINDINGS OF FACT

### I.  Claims Against Defendants Cook and Mapes

In its Initial Review Order filed March 2, 2008, the Court dismissed Ross' claims against Cook and Mapes for actions they took as supervisors, because state officials may not be held liable in section 1983 actions under a respondeat superior theory for a subordinate's constitutional violations.  *See Ambrose v. Young*, 474 F.3d 1070, 1079 (8th Cir. 2007).  The Court, however, allowed the claims against Cook and Mapes to go forward insofar as the two officials are named as defendants based on the alleged unconstitutional policies and practices. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978) (concluding that Congress did not intend municipalities to be liable under section 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort").

In his Complaint, Ross asserts the following claim against Cook:  "Donna Cook as Dr. Keller[']s supervisor failed to supervise and follow, Health Services Policy HSP-82.1001

---

[7] Policy HSP-82.1001 states, "Patients Do Not Pay For Dental Treatment[.]  The patient's willingness to pay for treatment is not an option that can be honored.  This would be an unfair advantage that the patient without money does not have."  (Compl. Attach. 16 (alteration added).)

Section IV, Priority II (A[]).''  (Compl. ¶ V (alterations added).)  For his claim against Mapes, the inmate alleges, "Terry Mapes was deliberately indifferent as he failed to supervise Donna Cook and follow the same policies and procedures and failed to hire proper medical personnel to perform root canals on molars, or to refer, [sic] me someplace to receive proper medical attention."  *Id.*  The Court construes Ross' Complaint as alleging that IDOC's Policy HSP-82.1001 Section IV, Priority II (A) made root canals and crowns available to inmates, but Cook and Mapes failed to follow the written policy, and as a result, Ross was denied a root canal and crown based on unconstitutional policies and practices for which Cook and Mapes are responsible.

Policy HSP-82.1001 Section IV, Priority II (A) directed dental staff to schedule for treatment as soon as possible, "Gross caries requiring extraction, pulpotomy, sedative fillings, or major operative treatment."  (Compl. Attach. 4.)  As noted above, a pulpotomy is the removal "of the coronal portion of the pulp of a tooth in such a manner that the pulp of the root remains intact and viable." MERRIAM-WEBSTER'S MEDICAL DICTIONARY 625.  In contrast to a pulpotomy, however, a root canal involves extirpation, or pulpectomy, which entails removing pulp tissue from both the tooth and its root, as Dr. Keller testified.  Accordingly, the Court finds Ross is mistaken in his allegation that Policy HSP-82.1001 Section IV, Priority II(A) made root canals and crowns available to inmates.  The Court finds Ross has not established that Cook and Mapes failed to follow policies and procedures stated in Policy HSP-82.1001 Section IV, Priority II(A).

Although Policy HSP-82.1001 Section IV, Priority II(A) did not address root canals and crowns, the evidence indicates two other provisions of Policy HSP-82.1001 had a bearing on the decision to deny Ross' request for a root canal and crown.  First, a policy provision specified that

15

fixed prosthetics, which include crowns, would not be provided to inmates.  A second provision provided that the only dental specialty in which any referrals could be made was oral surgery.  In Dr. Keller's medical opinion, successful performance of a root canal on Ross' tooth #19 required a specialist, specifically an endodontist, and a crown.  Ross did not provide any expert testimony to refute Dr. Keller's opinion.

As discussed below, the evidence does not indicate that Dr. Keller violated any of Ross' Eighth Amendment rights in applying the policy to him.  Accordingly, the Court finds Ross has not shown that the dentist's actions caused the alleged constitutional violation pursuant to the official prison policy or practice he claims imposes liability on Cook and Mapes.  *See Salahuddin v. Goord*, 467 F.3d 263, 282 (2d Cir. 2006) (determining summary judgment in favor of department of corrections official was proper; inmate's claim against official for his role in promulgating the disputed guideline failed, because inmate had not raised a triable question concerning whether unconstitutional practices occurred under the guideline when prison doctor canceled inmate's liver biopsy); *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006) (holding summary judgment in favor of Correctional Medical and the medical personnel was warranted, when no evidence indicated one-month delay in getting X-ray of inmate's hand was result of anything other than negligence, and, moreover, inmate had not pointed to any policy, custom, or official action by Correctional Medical that resulted in delay).

Even if it could be found that Dr. Keller violated Ross' Eighth Amendment rights and that the dentist's actions pursuant to IDOC's policy caused the constitutional violation, the Court finds that no evidence indicates either Cook or Mapes was responsible for IDOC's dental policy or had any involvement in developing or adopting the policy.  Furthermore, the Court finds that no evidence shows Cook or Mapes, in enforcing and putting the policy into practice in Ross'

16

case, received any notice that the medically appropriate decision was to depart from the policy and provide Ross with a root canal and crown. *Cf. Johnson v. Wright*, 412 F.3d 398, 405 (2d Cir. 2005) (concluding fact question existed concerning whether defendants mechanically followed prison guideline's substance abuse policy, even though plaintiff's physicians, including prison physicians, unanimously advised the defendants that the medically appropriate treatment was to depart from the guidelines to prescribe certain drugs for the prisoner).

For these reasons[8], the Court finds Ross has not shown that either Cook or Mapes is liable under section 1983 based on the alleged unconstitutional policies and practices. The Court therefore respectfully recommends that Ross' claims against Defendants Cook and Mapes be denied.

## II.  Claims Against Defendant Dr. Keller

If a prison's medical staff member commits "'acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs',' the staff member violates the Eighth Amendment. *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). To prevail on a claim alleging deprivation of medical care, the inmate must show "(1) an objectively serious medical need; and (2) the defendants actually knew of the medical need but were deliberately indifferent to it." *Jones v. Minnesota Dep't of Corr.*, 512 F.3d 478, 481 (8th Cir. 2008); *accord Meuir*, 487 F.3d at 1118.

An inmate whose mouth shows "obvious signs of serious infection, such as swelling,

---

[8] The Court finds the same reasoning that applies to Ross' claims based on the policy and practices in effect when Dr. Keller was working at NCF applies also to the policy and practices in effect after Dr. Keller retired from NCF.

bleeding, or pus" and who complains of severe tooth pain has a serious medical need. *Hartsfield*

*v. Colburn*, 491 F.3d 394, 397 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 1745 (2008). Here,

Defendants do not dispute, and the Court finds, that Ross' pain and infection in tooth #19

constitute a serious medical need.

The issue is whether Dr. Keller acted with deliberate indifference in treating Ross.

Deliberate indifference to a serious medical need "must rise to the level of an unnecessary and

wanton infliction of pain." *Hines v. Anderson*, 547 F.3d 915, 921 (8th Cir. 2008) (quoting

*Jorden v. Farrier*, 788 F.2d 1347, 1348 (8th Cir. 1986)). Although the deliberate indifference

standard has a subjective component, "the prison official must actually know of the serious risk

of harm." *Id.*

### A. Requested Course of Treatment

Ross disagreed with Dr. Keller's recommendation to have tooth #19 extracted. Ross

instead wanted a root canal and crown for the tooth.

Inmates do not have a "constitutional right to receive a particular or requested course of

treatment, and prison doctors remain free to exercise their independent medical judgment." *Id.*

at 920 (quoting *Dulaney v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)); *see Estelle v.*

*Gamble*, 429 U.S. at 107 (stating, "the question whether . . . additional diagnostic techniques or

forms of treatment is indicated is a classic example of a matter for medical judgment"). To rise

to the level of a constitutional violation, it is insufficient for the inmate to have a mere difference

of opinion "over matters of expert medical judgment or a course of medical treatment." *Meuir*,

487 F.3d at 1118-19; *see Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) ("Rather, to

prevail on a claim involving choices between alternative courses of treatment, a prisoner must

show that the chosen course of treatment 'was medically unacceptable under the circumstances,'

and was chosen 'in conscious disregard of an excessive risk' to the inmate's health.") (quoting *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir. 1996)).  If an official acts reasonably, "though through hindsight is found to have acted incorrectly," the official has not violated the Eighth Amendment, and therefore medical malpractice does not necessarily constitute an Eighth Amendment violation.  *Hines*, 547 F.3d at 920.

Ross preferred having a root canal and crown rather than an extraction, in part because he had already lost a molar on the right side of his mouth, and he believed that losing a molar on the left side would make chewing even more difficult than it already was.  Although the Constitution does not permit inhumane prisons, it also "does not mandate comfortable" ones.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  The Eighth Amendment requires prison officials to ensure inmates receive only "adequate," medical care.  *Id.*  Dr. Keller testified why he believed extraction was medically acceptable under the circumstances.  He noted that extraction was the treatment Ross would have received if he had been a patient at Broadlawns or at certain Army facilities.  The written policy indicated that a removable prosthesis, such as partial dentures, would be available if Ross later needed aid in chewing.  The Court finds that extraction was medically acceptable under the circumstances; Dr. Keller's treatment of Ross was reasonable.

Concerning whether Dr. Keller recommended extraction in conscious disregard of an excessive risk to Ross' health, the Court finds that the dentist did not reject the inmate's requests for a root canal and crown because he was deliberately indifferent to Ross' medical needs.  Rather, Dr. Keller rejected Ross' requests because the dentist sincerely believed he was required to comply with IDOC's policy permitting neither crowns nor referrals to endodontic specialists, both of which Dr. Keller considered medically necessary for the performance of a successful root canal on Ross' molar, and because the dentist sincerely believed that applying this policy

19

and offering extraction as an alternative was an effective, medically acceptable treatment for Ross, even during the period when Dr. Keller thought a root canal and crown performed by a specialist would be effective.  No evidence indicates that Dr. Keller believed a root canal and crown were medically necessary for Ross at any time.

The Court finds Dr. Keller did not choose extraction in conscious disregard of an excessive risk to Ross' health.  *Cf. Johnson*, 412 F.3d at 404 (noting a jury could find that the defendants rejected the requests to treat the inmate plaintiff with a particular drug therapy, not because the defendants were in any way indifferent to the inmate's needs, but because the defendants sincerely and honestly believed that they were required to comply with the substance abuse policy and that applying this policy was medically justifiable in the inmate's case); *compare Banks v. York*, 515 F. Supp. 2d 89, 103 (D.D.C. 2007) (holding detainee's allegations were insufficient to state an Eighth Amendment claim for inadequate dental care, when allegation was based solely on department of corrections' dental staff's failure to provide him with a replacement crown; detainee acknowledged that department's dental unit treated him with antibiotics and offered to extract the seven affected teeth, which apparently was the only treatment the department of corrections could provide) *with Chance v. Armstrong*, 143 F.3d 698, 703-04 (2d Cir. 1998) (holding plaintiff, a state prisoner, had sufficiently alleged an Eighth Amendment claim for inadequate dental care based on prison dentists' decision to extract two infected teeth rather than filling them, when plaintiff alleged the dentists recommended extraction because they would be better compensated for extractions, not because of their medical views; the allegations regarding the dentists' financial incentives would show the dentists had a culpable state of mind and that their treatment choice "was intentionally wrong and did not derive from sound medical judgment").

The Court finds that Ross has not shown that Dr. Keller was deliberately indifferent to his medical needs on the basis that the dentist acted unreasonably in recommending extraction; extraction was medically acceptable under the circumstances and was not chosen in conscious disregard of an excessive risk to Ross' health.  The Court respectfully recommends that this claim be denied.

**B.  Delay in Treatment**

Ross' allegations may also be construed as a claim that Dr. Keller delayed in treating tooth #19.

When an inmate alleges that a treatment delay rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should be measured "by reference to the effect of delay in treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (emphasis deleted), *cert. denied sub nom. Laughlin v. Crawford*, 549 U.S. 927 (2006).  To establish the detrimental effect of a treatment delay, the inmate must place "verifying medical evidence in the record." *Id.*  Here, Ross testified he continued to suffer a great deal of pain as a result of the delay in getting treatment for tooth #19.

The Court finds that Dr. Keller did not deliberately delay treatment of Ross' dental pain and infection.  The dentist provided treatment, including antibiotics, and a treatment plan of extracting tooth #19.  He referred the inmate to UIHC to allow him to hear from another dentist the diagnosis and recommended treatment, and to get tooth #19 extracted.  Dr. Keller put Ross on the tooth extraction list more than one time.  The extraction he recommended would have ended the pain and infection in Ross' tooth.  Ross nevertheless repeatedly declined to have his tooth pulled.  The only delay Ross has experienced in getting treatment to end his recurrent infection and pain has been caused by his decision not to follow Dr. Keller's advice to get the

tooth pulled. *See Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1189 (11th Cir. 1994),

*overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n. 9 (2002) (holding

supervisor was not deliberately indifferent to juvenile detainee's medical needs because of four-

hour delay in transporting juvenile to hospital, when greatest delay in medical treatment was

attributable to juvenile waiting approximately seven hours to report blood smear, and

transportation delay did not detrimentally exacerbate medical problem, which was not serious

medical need to extent of requiring immediate emergency care) (cited in *Williams v. Kelso*, 201

F.3d 1060, 1065 (8th Cir. 2000)); *Liggins v. Barnett*, No. 4-00-CV-90080, 2001 WL 737551, at

*8 (S.D. Iowa May 15, 2001) (finding much of the delay inmate experienced in seeing a doctor

was attributable to inmate's initial failure to follow prison's sick-call procedure; finding inmate

failed to set forth sufficient evidence to show nurse was deliberately indifferent to inmate's

serious medical needs, and recommending District Court grant nurse's motion for summary

judgment ); *Haberstick v. Nesbitt*, No. Civ.A. 97-6523, 1998 WL 472447, at *4 (E.D. Pa. July

29, 1998) (holding no evidence showed defendants exercised deliberate indifference towards

plaintiff's medical needs by delaying or withholding necessary treatment; plaintiff delayed his

hernia surgery by refusing to allow doctor to perform surgery until plaintiff was satisfied that

doctor was qualified to perform such surgery).

Dr. Keller handled Ross' request in a manner consistent with prison policy and his

professional judgment.  To the extent confusion or misunderstanding existed between Ross and

Dr. Keller concerning, among other matters, the reason the dentist did not refer Ross to UIHC

for a root canal and crown, the condition of Ross' tooth #19, the need for an endodontist rather

than an oral surgeon to perform the root canal, or the reason for the May 22, 2008, referral to

UIHC, the confusion or misunderstanding does not establish an Eighth Amendment violation.

22

*Cf. Bender v. Regier*, 385 F.3d 1133, 1138 (8th Cir. 2004) (confusion among medical staff did not establish inmate's claim of an Eighth Amendment violation; stating an inadvertent failure to provide adequate medical care did not violate the Constitution).

The Court finds that Ross has not shown that Dr. Keller acted with deliberate indifference to his serious medical need based on a claim of delay in treatment.

The Court finds that Ross has not established his Eighth Amendment claim against Dr. Keller.  Therefore, the Court respectfully recommends that Ross' claims against Dr. Keller be denied.

## RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED that judgment be entered in favor of Defendants and that Plaintiff's claims be dismissed, because Plaintiff has not established a violation of his Eighth Amendment rights.

IT IS ORDERED that the parties have until February 16, 2009, to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997).  The Court will freely grant such extensions.  Any objections filed must identify the specific portion of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357.  Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357; *see Leonard v. Dorsey & Whitney*, Nos. 07-2220, 07-2242, 07-2258, 07-2260, 07-2261, 2009 WL 88855, at *9 (8th Cir.

Jan. 15, 2009) ("[o]bjection to a magistrate's report preserves only those objections that are specified") (quoting *Lewry v. Town of Standish*, 984 F.2d 25, 27 (1st Cir. 1993)).

IT IS SO ORDERED.

Dated this 27th day January, 2009.


_____
CELESTE F. BREMER
UNITED STATES MAGISTRATE JUDGE